**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ORLANDO STANFORD, | ) | |
| | ) | Civil Action No. 2:20-cv-01243 |
| *Petitioner*, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Lisa Pupo Lenihan |
| | ) | |
| THE ATTORNEY GENERAL OF | ) | |
| THE STATE OF PENNSYLVANIA, | ) | |
| DISTRICT ATTORNEY OF | ) | |
| WESTMORELAND COUNTY, and | ) | |
| BARRY SMITH, Superintendent of | ) | |
| SCI Houtzdale, | ) | |
| | ) | |
| *Respondents*. | ) | |

## MEMORANDUM OPINION[1]

Currently pending before the Court is a Petition for Writ of Habeas Corpus ("Petition") filed by Orlando Stanford ("Petitioner") pursuant to 28 U.S.C. § 2254.  (ECF No. 3.)  The Petition challenges Petitioner's judgment of sentence out of Westmoreland County at CP-65-CR-3058-2015, after a jury found him guilty of persons not to possess firearms and firearms not to be carried without a license.[2]  For the following reasons, the Petition will be denied and a certificate of appealability will also be denied.

A.    **Factual and Procedural Background**

The following is a summary of the facts underlying this action, as set forth by the trial court:

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case, including the entry of a final judgment.

[2] The docket sheet for Petitioner's criminal case can be found online at ujsportal.us/CaseSearch and on the docket at ECF No. 14-2, pp.1-42.

Trial commenced following jury selection on October 2, 2017.  The Commonwealth first presented the testimony of Sergeant [Daniel] Uncapher.  At the time of trial, Sergeant Uncapher was employed by the Allegheny Township Police Department.  He worked for the police department for twenty-four (24) years.  Sergeant Uncapher worked as a patrolman at the time of the incident in 2014.  He spent the majority of his time working "on the road" rather than at the station.  Sergeant Uncapher's duties as a patrolman included accident investigation, general investigation, patrol operations, and answering calls for service.  In addition, he would assist local police departments upon request.  He also assisted other agencies in the past with the service of arrest warrants.  Sergeant Uncapher testified that, in addition to receiving the written warrant, he [could] verify the validity of a warrant by contacting Westmoreland County 911.  Westmoreland County 911 will confirm or deny the warrant by running an NCIC search of the individual's name.

On December 21, 2014, Sergeant Uncapher was dispatched by Westmoreland County 911 to the Sandalwood apartment complex (hereinafter "Sandalwood").  [Westmoreland County 911] received an anonymous tip that [Petitioner] was located at Sandalwood and there was an active warrant for his arrest.  Sergeant Uncapher was also informed that [Petitioner] was potentially armed with a weapon.  He confirmed that there was an active warrant for [Petitioner's] arrest through Westmoreland County 911.  Westmoreland County 911 advised Sergeant Uncapher that there was an active warrant for [Petitioner] out of Pennsylvania State Parole.  [Sergeant Uncapher] was not aware of [Petitioner] prior to this incident.  He believed that the apartment was rented by Amber Lovelace, but he did not know this information prior to serving the warrant.  Sergeant Uncapher requested assistance from Officer Hosack in serving the warrant.  At the time of trial, Officer Hosack was no longer employed by the Allegheny Township Police Department.

Sergeant Uncapher testified that he was familiar with Sandalwood as a police officer.  He described Sandalwood as a row of five (5), two-story apartments with a downstairs living and kitchen area and upstairs bedrooms and a restroom.  Upon arrival to Sandalwood, Sergeant Uncapher reported directly to the apartment in which [Petitioner] was allegedly present.  He observed that the front door of the apartment was open and approximately five (5) to ten (10) individuals were located throughout the first floor.  Sergeant Uncapher announced his presence to the individuals and Lovelace immediately approached the door.  He was not familiar with Lovelace prior to serving the warrant.  Sergeant Uncapher testified that Lovelace was "very friendly" and she did not object to him being at her home.  He asked for permission from Lovelace to enter the home.  She confirmed that [Petitioner] was in the apartment and was located in the upstairs bedroom.  Sergeant Uncapher did not attempt to speak with the other individuals in the apartment because it was "so loud" and there were "so many people there."  He maintained that he was not familiar with [Petitioner] prior to

2

this incident and he did not receive anything that would allow him to identify [Petitioner].

Officer Hosack subsequently approached Sergeant Uncapher and Lovelace from the back door of the apartment.  Sergeant Uncapher and Officer Hosack reported to the upstairs bedroom.  In the bedroom, they observed a male lying on a bed where [Petitioner] was reportedly located.  The individual was later identified as [Petitioner].  [Petitioner] was the only individual located in the bedroom.  Sergeant Uncapher testified that they shouted for [Petitioner] and announced their presence, but [Petitioner] did not respond.  Sergeant Uncapher assumed [Petitioner] was sleeping.  Sergeant Uncapher and Officer Hosack subsequently began handcuffing [Petitioner] and he woke up.  Sergeant Uncapher explained who they were to [Petitioner] and why they were there.  He testified that [Petitioner] was dressed in a tank top and a pair of dark colored jeans that day.

Sergeant Uncapher searched [Petitioner] and Officer Hosack maintained control of [Petitioner] during the search.  Sergeant Uncapher could not recall if [Petitioner] was sitting or standing during the search.  He testified, however, that an individual is generally standing when he conducts a search.  [Petitioner] did not present any problems during the search.  Officer Hosack indicated that a weapon was present in [Petitioner's] "crotch area" and Officer Hosack retrieved an automatic pistol from this area.  Sergeant Uncapher subsequently "cleared" the firearm.  He testified that "clearing" the firearm consists of emptying the firearm's magazine and unchamber[ing] any rounds.  He did not discover any rounds in the firearm's chamber, but he did recover eight (8) rounds in the firearm's magazine.  Sergeant Uncapher described the firearm as a nine-millimeter Taurus PT24/7.  After Sergeant Uncapher cleared the weapon, he returned to his station.  He entered the firearm into evidence and placed it into an evidence locker.  The firearm was also submitted to the Crime Lab.  The bullets were eventually destroyed in accordance with the department's policy against retaining ammunition.

Sergeant Uncapher contacted Pennsylvania State Parole and advised them that [Petitioner] was in custody.  [Petitioner] was transported back to the Allegheny Township Police Department and was taken to the processing room and holding cell.  Sergeant Uncapher testified that [Petitioner] requested to speak with him while he was entering charges and evidence.  More specifically, [Petitioner] was willing to speak with him if it "helps him out."  Sergeant Uncapher read [Petitioner] his Miranda rights, which are generally read from a departmental form.  [Petitioner] indicated that he still wished to speak with Sergeant Uncapher.  [Petitioner] allegedly told Sergeant Uncapher that he was aware that he was a felon and was not to possess a firearm.  [Petitioner] also stated that he was at the apartment on the night prior to the incident and was "hanging out" with Lovelace.  At one point, [Petitioner] supposedly met a male

3

who was known as "Jay."  [Petitioner] allegedly purchased marijuana from Jay the night before and Jay possessed the firearm that was subsequently found on [Petitioner].  Sergeant Uncapher testified that [Petitioner] agreed to hold the weapon for Jay and he fell asleep with it in his pants.  Sergeant Uncapher was not aware if Jay was present at the apartment on the date of the incident.

Sergeant Uncapher subsequently prepared a police report of the incident. He did not obtain a written statement from [Petitioner] and did not provide a specific reason as to why he did not take a written statement.  He did, however, state that [Petitioner] did not provide much information to him aside from the name "Jay."  Sergeant Uncapher asked questions to the other residents of Sandalwood regarding Jay, but no one could confirm his identity.  Additionally, he identified "Cade Kennamuth" as the last registered owner of the firearm found on [Petitioner].

The Commonwealth thereafter presented the testimony of Officer Seth Hosack.  At the time of trial, Officer Hosack was employed by the New Kensington Police Department as a police officer.  He worked as a police officer for thirteen (13) years.  On the date of the incident, Officer Hosack was employed by the Allegheny Township Police Department as a patrolman.  Officer Hosack testified that he received information that a wanted individual was armed at Sandalwood.  Officer Hosack and Sergeant Uncapher reported to Sandalwood. Upon their arrival, Sergeant Uncapher traveled to the front and Officer Hosack went to the back of the residence.  He testified that the back door of the apartment was open.  At one point, Officer Hosack observed Sergeant Uncapher speaking with Lovelace.  He testified that Lovelace did not appear to be agitated with their presence and the individuals at the apartment were "very nice."  Lovelace allegedly indicated that [Petitioner] was upstairs in the bedroom.

Officer Hosack and Sergeant Uncapher proceeded to the upstairs bedroom of the apartment.  Officer Hosack testified that an individual appeared to be sleeping in the bedroom.  This individual was later identified as [Petitioner]. Officer Hosack holstered his weapon and held his Taser to protect Sergeant Uncapher as he apprehended [Petitioner].  Officer Hosack thereafter searched [Petitioner] while he was secured in handcuffs and lying on the bed.  He could not recall the directing in which [Petitioner] was lying.  Officer Hosack testified that he reached near [Petitioner's] "crotch area" and felt what he believed to be a firearm based on its shape, size, and density.  He announced the presence of the weapon while searching [Petitioner] and retrieved a [firearm] with "some difficulty."  Officer Hosack testified that [Petitioner] was wearing multiple layers of clothing and the firearm was found in the front flap of [Petitioner's] long underwear.  Officer Hosack gave Sergeant Uncapher the weapon while he secured [Petitioner].  Sergeant Uncapher "cleared" the weapon.  They subsequently proceeded to the police station.  Sergeant Uncapher filed [Petitioner's] charges. Officer Hosack was not present for any statements made by [Petitioner] at the

police station and he did not participate in the investigation of [Petitioner's] case. He was also not aware of any fingerprint evidence that may have been recovered from the firearm.

Sergeant Uncapher was thereafter called again by the Commonwealth to testify. The Commonwealth requested the opportunity to briefly question Sergeant Uncapher in response to questions asked by Defense Counsel regarding fingerprint or DNA evidence on the firearm. Sergeant Uncapher was familiar with the availability of fingerprint and DNA testing at the State Police Crime Lab in Greensburg. He testified that these tests may be costly depending on the number of tests that are required. Sergeant Uncapher does not generally consider this in determining whether to submit items for fingerprint or DNA testing, unless there is a subsequent AFIS hit on a ballistics cartridge. He testified that it is not common to submit items that are found on a person's body for fingerprint or DNA testing. Sergeant Uncapher was not aware of the exact number that it would have cost to perform testing in the instant case. He estimated, however, that the cost to perform testing could have been "in the thousands." Sergeant Uncapher testified that, to his knowledge, the firearm that was found on [Petitioner] was never tested for fingerprints.

Upon the conclusion of the Commonwealth's case, Defense Counsel moved for a judgment of acquittal with respect to both of [Petitioner's] charges. He argued that the case began with an anonymous tip and the testimony of Lovelace and the individual who made the anonymous tip were not presented by the Commonwealth in this case. Defense Counsel maintained that the Commonwealth provided the testimony of the officers only, who indicated that [Petitioner] had a firearm. Ultimately, [counsel argued] that the Commonwealth was unable to establish that [Petitioner] had the intent to possess, control, or use or carry a firearm. Defense Counsel reiterated that [Petitioner] was sleeping in the bed and allegedly had the firearm on his person. He [argued] that insufficient evidence was presented to establish that [Petitioner] had the requisite intent for these charges to be submitted to the jury. Furthermore, he restated that the gun was never processed for prints or DNA evidence. Defense Counsel's Motion was noted for the record and denied. Th[e] Court found that there was sufficient evidence for the charges to be sent to the jury.

[Petitioner] additionally testified at trial regarding the incident. On the date prior to [Petitioner's] arrest, he [traveled] to Lovelace's apartment at Sandalwood. He identified Lovelace as his friend. [Petitioner] stated that he knew Lovelace for about a month and Sergeant Uncapher's statement that he knew her for approximately two (2) weeks was incorrect. [Petitioner] testified that there were about four (4) to five (5) other individuals present at Lovelace's apartment. He was not familiar with all of the individuals. He did recall, however, that one of the individuals was named Zach Ferguson. At the apartment, they were "smoking, hanging out, laughing, watching videos, [and]

movies." At around 1:00 or 2:00 a.m., [Petitioner] fell asleep in the upstairs master bedroom of the apartment. He did not recall informing Sergeant Uncapher that he fell asleep at approximately 4:00 a.m. and indicated that his statement was incorrect. [Petitioner] testified that there were two (2) bedrooms located in the apartment. Additionally, no one else was present in the bedroom with [Petitioner] when he went to sleep; however, several other individuals were still present in the apartment at the time he went to sleep and they were mostly downstairs.

[Petitioner] woke up from sleeping while he was being handcuffed. He testified that he heard the officer announce his presence and request [Petitioner's] identity. [Petitioner] announced his identity to the officer. [Petitioner] denied obtaining a firearm from anyone and testified that a firearm was not located on his person at the time he went to sleep. [Petitioner] also claimed that he never observed the firearm that he was charged with possessing. He testified that he did not know that he had an active warrant out for his arrest due to missing a parole appointment. [Petitioner] was searched while he was being handcuffed. He testified that he was lying on his right shoulder during the search and the officer helped him get out of bed. Additionally, he testified that Sergeant Uncapher's statement as to what he was wearing was incorrect and he was not wearing long underwear or jeans when he woke up. He also stated that he was not wearing gym shorts. Rather, [Petitioner] claimed that he was dressed in a white tank top, boxers, and socks at the time he was handcuffed. He testified that he asked to put on his pants and shoes after he was handcuffed and the officers permitted him to do so. He also stated that one of the officers assisted him with putting additional clothing on. Additionally, [Petitioner] put on long johns. [Petitioner] also testified that he was searched by the officers after he was permitted to put on his additional clothing. He also did not recall seeing anyone else arrested at the apartment.

[Petitioner] recall[ed] signing a document entitled "Constitutional Rights" on the date of the incident that was prepared by Sergeant Uncapher. [Petitioner] testified that he was located in the Allegheny Township Police Department holding cell while signing the document. The document informed [Petitioner] of his rights and included a statement providing that the officer read [Petitioner] his rights and [Petitioner] understood what his rights were. Additionally, it provided that [Petitioner] was willing to make a statement and answer the questions asked of him. It also stated that [Petitioner] did not wish to have a lawyer present. The document further indicated that no promises or threats had been made to induce [Petitioner] to make a statement and no pressure or coercion of any kind had been used against him. [Petitioner] spoke voluntarily with Sergeant Uncapher after signing the document. [Petitioner] testified that Sergeant Uncapher asked him if he was willing to answer a few questions and he agreed. [Petitioner] denied initiating the conversation with Sergeant Uncapher and stating that he would like to help himself out if he could. He testified that Sergeant Uncapher did not provide him with the option to have his statement written or recorded.

[Petitioner] testified that Sergeant Uncapher's partner was also present during his questioning.  [Petitioner] allegedly told Sergeant Uncapher that he was at Sandalwood for one (1) or two (2) days and he knew Lovelace.  [Petitioner] also informed Sergeant Uncapher that he thought Lovelace was a "good person" and they did not have a romantic relationship.  Additionally, [Petitioner] told Sergeant Uncapher that he knew Lovelace for about a month.  He testified that he knew he had a warrant issued by probation and parole due to missing a scheduled appointment with his parole officer.  He also informed Sergeant Uncapher that he had a few discrepancies with probation and parole regarding working and missing appointments.  [Petitioner] was aware that he was not allowed to possess any firearms.  [Petitioner] did not question Sergeant Uncapher when he was asked if he knew he was not allowed to possess a firearm.  Instead, [Petitioner] stated that he was not "worried about it" because he did not have anything to do with the firearm.  [Petitioner] denied having an interest in guns and telling the officer that he had an infatuation with guns.  He also testified that he did not tell Sergeant Uncapher that he fell asleep at 4:00 a.m. with a gun in his pants.

[Petitioner] denied telling Sergeant Uncapher that an individual by the name of Jay was present at the apartment.  Additionally, [Petitioner] testified that he did not tell the officer that he had purchased marijuana from Jay at the apartment.  He also denied ever telling the officer that Jay showed him a gun.  He testified that no one in the apartment had a gun that he had asked to see and he never asked anyone to let him hold a gun while he was at the apartment.  [Petitioner] again testified that he was not in possession of a firearm at the time he went to sleep.  [Petitioner] disagreed with the officer's testimony regarding what he had told the police about the incident.  [Petitioner] testified that he was asked general questions by the officer regarding his background, employment, history, and living situation.  [Petitioner] resided with his grandmother at the time of the incident and he did not live at Sandalwood.

Additionally, the officer allegedly asked [Petitioner] if he knew who owned the firearm and [Petitioner] replied in the negative.  [Petitioner] testified that he was not shown the firearm and the officer did not notify him that he was in possession of a firearm.  [Petitioner] alleged that he did not know which firearm the officer was referring to, but he assumed that the officer was referencing the firearm that [Petitioner] observed in the front seat of the police vehicle.  [Petitioner] testified that he was handcuffed and seated in the back seat of the police vehicle.  He was able to observe the firearm, although there was a glass partition separating the front and the back seats.  [Petitioner] stated that the firearm he observed was the same firearm that was presented in the courtroom during trial.  This was allegedly the first time [Petitioner] had viewed the firearm.  [Petitioner] testified that he was not concerned with the firearm because it was not found on his person.  He did not question the fact that he was being asked about a firearm and he was not troubled by this because he had "nothing to do with it."

7

> [Petitioner] did not recall hearing anyone state the terms "gun," "weapon," or "firearm" in the apartment.  He also did not remember the officers ever mentioning a firearm while they were in the apartment and when he was awakened from his sleep.  [Petitioner] testified that he did not see any police officers carrying a gun out of the house with him.  Overall, [Petitioner] believed that he was innocent of the charges that were filed against him.

(ECF No. 14-6, pp.6-14) (internal citations to records omitted).

Petitioner was charged with and found guilty of persons not to possess firearms and firearms not to be carried without a license.  On January 23, 2018, he was sentenced to four (4) to ten (10) years of incarceration on the persons not to possess a firearm count, and to a three (3) to seven (7) years concurrent term of incarceration on the firearms not to be carried without a license count.  He filed post-sentence motions that were denied on May 14, 2018.  (ECF No. 14-5, pp.8-34; ECF No. 14-6.)

Petitioner appealed his judgment of sentence, and the Pennsylvania Superior Court affirmed on December 28, 2018.  (ECF No. 14-7; ECF No. 14-8.)  He filed a petition for allowance of appeal with the Pennsylvania Supreme Court, which was denied on May 14, 2019.  (ECF No. 14-9; ECF No. 15-1, p.2.)

On January 6, 2020, Petitioner filed a *pro se* petition pursuant to Pennsylvania's Post-Conviction Relief Act ("PCRA").  (ECF No. 15-1, pp.3-33.)  The PCRA court appointed counsel to represent Petitioner on January 14, 2020.  (ECF No. 15-1, p.34.)  Counsel filed a Turner/Finley[3] No-Merit Letter and moved to withdraw, and on February 19, 2020, the PCRA court notified Petitioner that it intended to dismiss his PCRA petition.  (ECF No. 15-1, pp.35-45.)  On May 8, 2020, the PCRA court granted counsel's motion to withdraw and denied the PCRA petition.  (ECF No. 15-1, p.46.)  Petitioner appealed (ECF No. 15-1, pp.47-48), but his

---

[3] Commonwealth v. Turner, 544 A.2d 927 (Pa. 1988) and Pennsylvania v. Finley, 481 U.S. 551 (1987).

appeal was dismissed on March 2, 2021, for his failure to file a docketing statement.  *See* Commonwealth v. Stanford, 1330 WDA 2020 (Pa. Super. Mar. 2, 2021).

Petitioner initiated the instant habeas proceedings on August 16, 2020, which was prior to the completion of his PCRA proceedings.[4]  His Petition and Brief in Support thereof were docketed after he paid the filing fee on October 13, 2020.  (ECF Nos. 3 & 4.)  Respondents filed their Answer to the Petition on January 28, 2021.  (ECF No. 14.)  Petitioner filed a Reply on February 18, 2021.  (ECF No. 19.)

It appears that Petitioner raises the following two claims in his Petition: (1) violation of due process in connection with his suppression hearing and the denial of his motion to suppress; and (2) ineffective assistance of counsel for failing to object to and preserve for appeal the Commonwealth's introduction of statements made by the anonymous 911 caller thereby permitting the introduction of hearsay evidence at trial in violation of the Confrontation Clause.

### B.    Standard of Review

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal habeas court may overturn a state court's resolution of the merits of a constitutional issue only if the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28

---

[4] Under the mailbox rule, a *pro se* prisoner's filing is deemed filed at the time he or she hands it over to prison officials to the court or puts it in the prison mailbox.  Houston v. Lack, 487 U.S. 266, 276 (1988).  Although the Petition was not received by the Clerk of Court until August 20, 2020, the Petition was signed and dated August 16, 2020.  As there is no evidence to the contrary, the Court will assume that Petitioner delivered his Petition for mailing on the date he signed it, August 16, 2020.  *See* West v. Lockett, 2009 WL 1270225, at *4 n.2 (W.D. Pa. May 6, 2009) ("Absent proof of the exact date of delivering the habeas petition to the prison authorities, the court will presume the date whereon [the petitioner] signed his habeas petition is the date he gave the prison authorities his habeas petition for mailing.") (citing cases).

U.S.C. § 2254(d)(1).  The Supreme Court of the United States, in <u>Williams v. Taylor</u>, 529 U.S.

362 (2000), discussed the analysis required by § 2254(d)(1):

> [Under the "contrary to" clause], a federal habeas court may grant the writ if the
> state court arrives at a conclusion opposite to that reached by this Court on a
> question of law or if the state court decides a case differently than this Court has
> on a set of materially indistinguishable facts.  Under the "unreasonable
> application" clause, a federal habeas court may grant the writ if the state court
> identifies the correct governing legal principle from this Court's decisions but
> unreasonably applies that principle to the facts of the prisoner's case.

<u>Id</u>. at 1498.  The Third Circuit Court of Appeals, consistent with the <u>Williams v. Taylor</u>

interpretation, set forth in <u>Matteo v. Superintendent, SCI-Albion</u>, 171 F.3d 877 (3d Cir. 1999),

*cert*. *denied* 528 U.S. 824 (1999), a two-tier approach to reviewing § 2254(d)(1) issues:

> First, the federal habeas court must determine whether the state court decision
> was "contrary to" Supreme Court precedent that governs the petitioner's claim.
> Relief is appropriate only if the petitioner shows that "Supreme Court precedent
> requires an outcome contrary to that reached by the relevant state court."  <u>O'Brien</u>
> [<u>v. Dubois</u>], 145 F.3d [16], 24-25 [1st Cir. 1998)].  In the absence of such a
> showing, the federal habeas court must ask whether the state court decision
> represents an "unreasonable application" of Supreme Court precedent; that is,
> whether the state court decision, evaluated objectively and on the merits, resulted
> in an outcome that cannot reasonably be justified.  If so, then the petition should
> be granted.

<u>Id</u>. at 891.  The phrase "clearly established Federal law," as the term is used in Section

2254(d)(1) is restricted "to the holdings, as opposed to the dicta of [the United States Supreme

Court] decisions as of the time of the relevant state-court decision."  <u>Williams</u>, 529 U.S. at 365.

Under the "unreasonable application" clause,

> a federal habeas court may not grant relief simply because that court concludes in
> its independent judgment that the relevant state-court decision applied clearly
> established federal law erroneously or incorrectly.  Rather, that application must
> also be unreasonable.

<u>Id</u>.  If a petitioner is able to satisfy the requirements of § 2254(d)(1), then the state court decision

is not entitled to deference under AEDPA and the federal habeas court proceeds to a *de novo*

evaluation of the constitutional claim on the merits.  *See* <u>Tucker v. Superintendent Graterford</u> <u>SCI</u>, 677 F. App'x 768, 776 (3d Cir. 2017) (citing <u>Panetti v. Quarterman</u>, 551 U.S. 930, 953 (2007) ("When . . . the requirement set forth in § 2254(d)(1) is satisfied[,] [a] federal court must then resolve the claim without the deference AEDPA otherwise requires.").  Indeed, the Third Circuit recently explained that,

> [w]hile a determination that a state court's analysis is contrary to or an unreasonable application of clearly established federal law is necessary to grant habeas relief, it is not alone sufficient.  That is because, despite applying an improper analysis, the state court still may have reached the correct result, and a federal court can only grant the Great Writ if it is "firmly convinced that a federal constitutional right has been violated," <u>Williams</u>, 529 U.S. at 389, 120 S.Ct. 1495. *See also* <u>Horn v. Banks</u>, 536 U.S. 266, 272, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002) ("[w]hile it is of course a necessary prerequisite to federal habeas relief that a prisoner satisfy the AEDPA standard of review . . . none of our post-AEDPA cases have suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard").  Thus, when a federal court reviewing a habeas petition concludes that the state court analyzed the petitioner's claim in a manner that contravenes clearly established federal law, it then must proceed to review the merits of the claim de novo to evaluate if a constitutional violation occurred.  *See* <u>Lafler v. Cooper</u>, 566 U.S. 156, 174, 132 S.Ct. 1376, 182 L.Ed.2d 398 (2012).

<u>Vickers v. Superintendent Graterford SCI</u>, 858 F.3d 841, 848-89 (3d Cir. 2017) (internal footnote omitted).

The AEDPA further provides for relief if an adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  Under § 2254(d)(2), a state court decision is based on an "unreasonable determination of the facts" if the state court's factual findings are "objectively unreasonable in light of the evidence presented in the state-court proceeding," which requires review of whether there was sufficient evidence to support the state court's factual findings.  *See* <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003).  Within this overarching

standard, a petitioner may attack specific factual determinations that were made by the state court, and that are subsidiary to the ultimate decision.  Here, § 2254(e)(1) comes into play, instructing that the state court's determination must be afforded a presumption of correctness that the petitioner can rebut only by clear and convincing evidence.  Lambert v. Blackwell, 387 F.3d 210, 235 (3d Cir. 2004).

> C.  **Discussion**
>
> > 1.  **Claim one**

In claim one, Petitioner argues that his due process rights were violated in connection with his suppression hearing and the denial of his motion to suppress.  As background, Petitioner sought to suppress evidence seized at the time of his arrest and to suppress the out of court statements relied on by the police.  Specifically, he argued in his motion to suppress that the anonymous tip about his whereabouts was not sufficient to establish reasonable suspicion to pursue him, making his subsequent arrest improper and grounds for suppression.  The suppression court denied Petitioner's motion following a hearing held on October 24, 2016.  In an order denying Petitioner's post-sentence motions, the trial court recognized the general unreliability of anonymous tips to establish reasonable suspicion of criminal activity but noted that Sergeant Uncapher did not rely solely on the anonymous tip in this case before he proceeded to Sandalwood.  Instead, it noted that the tip led Sergeant Uncapher to have Westmoreland County 911 run Petitioner's name, which confirmed that there was an active warrant for Petitioner's arrest, and he thereafter proceeded to Sandalwood based on that information.  The trial court therefore found that the suppression court properly denied Petitioner's motion.  (ECF No. 14-6, pp.19-20.)  On appeal, Petitioner claimed that the trial court erred, but the Superior Court disagreed, adopting the trial court's opinion as its own.  (ECF No. 14-8, pp.2-12.)

Petitioner argues that he was denied a full and fair suppression hearing and that the suppression court's denial of his motion to suppress was incorrect.  Respondents argue that Petitioner's claim is barred by <u>Stone v. Powell</u>, 428 U.S. 465 (1976).  In <u>Stone</u>, the United States Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  <u>Id</u>. at 494.  Seeking to avoid this restriction, Petitioner seizes upon the qualifying phrase in <u>Stone</u>, "where the State has provided an opportunity for full and fair litigation," and argues that he did not have an opportunity for full and fair litigation, and therefore, presumably, that the bar of <u>Stone</u> should not apply.

The Supreme Court has not defined the phrase "opportunity for full and fair litigation." However, the Third Circuit has noted that a state's "failure to give at least colorable application of the correct Fourth Amendment constitutional standard" might amount to a denial of the opportunity for full and fair litigation, *see* <u>Gilmore v. Marks</u>, 799 F.2d 51, 57 (3d Cir. 1986), as would a structural defect in the system itself which prevents a Fourth Amendment claim from being heard, *see*, *e.g.*, <u>Boyd v. Mintz</u>, 631 F.2d 247, 250-51 (3d Cir. 1980).  This is not one of those cases.  Petitioner had a full and fair opportunity to present his claim to the state courts, a process of which he availed himself, and has not alleged any facts that would demonstrate a breakdown of that process.  At most, Petitioner is alleging that the Fourth Amendment claims "were decided incorrectly or incompletely . . ., allegations which are insufficient to surmount the <u>Stone</u> bar."  <u>Marshall v. Hendricks</u>, 307 F.3d 36, 82 (3d Cir. 2002).

In his Petition and Reply brief, it appears that Petitioner attempts to avoid <u>Stone</u> by arguing that his claim is for a violation of his due process rights, not the Fourth Amendment.

However, the Third Circuit has stated that "a petitioner may not cloak his or her Fourth Amendment claim in due process clothing to circumvent <u>Stone v. Powell</u>." <u>Gilmore</u>, 799 F.2d at 57. Essentially, this is what Petitioner has attempted to do. At most he has alleged an erroneous determination by the state courts but has not alleged such egregious conduct that would implicate a due process violation.

Furthermore, Petitioner did not raise this claim in the context of a due process violation before the state courts. Therefore, such a claim is unexhausted and procedurally defaulted, and Petitioner has not argued for the application of either exception to the procedural default doctrine. *See* § C(2), *infra* (discussion on exhaustion and procedural default). For this reason, any due process claim Petitioner may be attempting to raise is barred from habeas review.

## 2. <u>Claim two</u>

In claim two, Petitioner argues that his trial counsel was ineffective for failing to object to, and preserve for appeal, the Commonwealth's introduction of statements made by the anonymous caller during the initial 911 call, which he claims permitted the introduction of hearsay evidence at trial in violation of the Confrontation Clause. Petitioner raised this claim in his PCRA petition, and the PCRA court found the claim without merit because trial counsel had no basis to object to the admissibility of the statements. Specifically, it stated as follows:

> Upon a review of the Trial Transcript, and as stated above, the Commonwealth did not call the anonymous caller as a witness to testify at trial. Rather, the Commonwealth introduced said evidence through the testimony of Sgt. Uncapher. Sgt. Uncapher relayed that he received a dispatch from Westmoreland County 911 relating an anonymous tip that revealed that Mr. Stanford, who was believed to have an outstanding warrant, was located at Apartment 164 of the Sandalwood apartment complex and may possibly be armed with a weapon. TT. at 46.
>
> Prior to the commencement of trial, and in an abundance of caution, Trial Counsel renewed Mr. Stanford's Motion in *Limine* to preclude the hearsay

14

evidence that Mr. Stanford previously filed *pro se* in August of 2016.  TT at 3-5.
Trial Counsel indicated on the record that he believed that Mr. Stanford would
raise the claim that Ms. Lovelace's statement to the Allegheny Township Police
and the statement from the anonymous caller should be considered inadmissible
hearsay.  Id.  Contrary to Mr. Stanford's belief, Trial Counsel opined that the
argument was meritless as said testimony is admissible if being offered for
background information.  Id.  This Court agreed with Trial Counsel and denied
the Motion in *Limine*.

> Despite Mr. Stanford's contention, the Court finds that Mr. Stanford is
unable to establish a meritorious claim of ineffective assistance of trial counsel.
This matter was previously addressed on the record prior to trial and on appeal.
The Court found that the statements were not being offered for their truth but
rather for the effect they had on Sgt. Uncapher and to demonstrate Sgt.
Uncapher's and Officer Hosack's subsequent course of conduct in furthering their
investigation.  As such, Trial Counsel had no basis to object to the admissibility of
the statements, and Mr. Stanford's claim is wholly without merit.

(ECF No. 15-1, pp.42-43.)  Petitioner appealed the PCRA court's denial of his petition, but the

Superior Court dismissed Petitioner's appeal for his failure to file a docketing statement as

required by Pa. R.A.P. 3517.  *See* Commonwealth v. Stanford, 1330 WDA 2020 (Pa. Super. Mar

2, 2021).  Petitioner never moved to reinstate his appeal.

The provisions of the federal habeas corpus statute at 28 U.S.C. § 2254(b) require a state

prisoner to exhaust available state court remedies before seeking federal habeas relief.  This

"exhaustion" requirement is "grounded in principles of comity; in a federal system, the States

should have the first opportunity to address and correct alleged violations of state prisoner's

federal rights."  Cristin v. Brennan, 281 F.3d 404, 410 (3d Cir. 2002) (quoting Coleman v.

Thompson, 501 U.S. 722, 731 (1991)).  *See also* O'Sullivan v. Boerckel, 526 U.S. 838, 844

(1999).  A petitioner shall not be deemed to have exhausted state remedies if he has the right to

raise his claims by any available state procedure.  28 U.S.C. § 2254(c).

In order to exhaust a claim, a petitioner must "fairly present" it to each level of the state

courts.  Lines v. Larkins, 208 F.3d 153, 159 (3d Cir. 2000) (citing 28 U.S.C. § 2254(b));

O'Sullivan, 526 U.S. at 848.  In Pennsylvania, this requirement means that a petitioner in a non-capital case must have presented every federal constitutional claim raised in his habeas petition to the Court of Common Pleas and then the Superior Court either on direct or collateral appeal. *See* Lambert v. Blackwell, 387 F.3d 210, 233-34 (3d Cir. 2004).

"When a claim is not exhausted because it has not been 'fairly presented' to the state courts, but state procedural rules bar the applicant from seeking further relief in state courts, the exhaustion requirement is satisfied because there is 'an absence of available State corrective process.'"  McCandless v. Vaughn, 172 F.3d 255, 260 (3d Cir. 1999) (quoting 28 U.S.C. § 2254(b)).  In such cases, however, applicants are considered to have procedurally defaulted their claims, Rolan v. Coleman, 680 F.3d 311, 317 (3d Cir. 2012) ("Procedural default occurs when a claim has not been fairly presented to the state courts . . . and there are no additional state remedies available to pursue . . . or, when an issue is properly asserted in the state system but not addressed on the merits because of an independent and adequate state procedural rule . . . .), and federal courts may not consider procedurally defaulted claims unless "the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[] will result in a fundamental miscarriage of justice."  Coleman, 501 U.S. at 750.  To show cause, a petitioner must demonstrate "some objective factor external to the defense" that prevented compliance with the state's procedural requirements.  Id. at 753 (citing Murray v. Carrier, 477 U.S. 478, 488 (1986)). To show a fundamental miscarriage of justice, a petitioner must demonstrate that he is actually innocent of the crime, McCleskey v. Zant, 499 U.S. 467, 494 (1991), by presenting new evidence of innocence.  Schlup v. Delo, 513 U.S. 298, 316 (1995).

Following the denial of this claim by the PCRA court, Petitioner raised it on appeal to the Superior Court, but his PCRA appeal was dismissed by the Superior Court for failing to comply with Pa. R.A.P. 3517.[5]  He therefore did not properly exhaust claim two, and, to the extent that he is now time-barred from raising the claim in state court in another PCRA petition,[6] the exhaustion requirement is excused but the claim is procedurally defaulted.  *See* Coleman, 501 U.S. at 735 n.1 (Where "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred[,] . . . there is a procedural default for purposes of federal habeas.").

Here, Petitioner fails to acknowledge his procedural default and has therefore made no effort to demonstrate cause and prejudice or a fundamental miscarriage of justice in order to excuse the procedural default of his claim.  Accordingly, claim two is barred from habeas review.

**D.**     **Certificate of Appealability**

A court should issue a certificate of appealability where a petitioner makes a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

---

[5] This rule has been found to be an independent and adequate state rule for purposes of the procedural default doctrine in habeas cases. *See* Boynton v. Cameron, No. 1:09-0053, 2009 WL 1653545 (W.D. Pa. June 11, 2009); Swinson v. Commonwealth, No. 07-3934, 2008 WL 4790608, at *9 (E.D. Pa. Oct. 31, 2008).

[6] A PCRA petition must be filed "within one year of the date the judgment becomes final."  42 Pa. C.S. § 9545(b).

Petitioner has not made the requisite showing in this case.  Accordingly, a certificate of appealability will be denied.  A separate order will issue.

Dated: February 2, 2023.

Lisa Pupo Lenihan
United States Magistrate Judge

Cc:    Orlando Stanford
       NU 9901
       SCI Houtzdale
       P.O. Box 1000
       209 Institution Drive
       Houtzdale, PA  16698

       Counsel of Record
       (*via CM/ECF electronic mail*)

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ORLANDO STANFORD,         )
                            )      Civil Action No. 2:20-cv-01243
              *Petitioner*,    )
                            )
       v.                 )      Magistrate Judge Lisa Pupo Lenihan
                            )
THE ATTORNEY GENERAL OF  )
THE STATE OF PENNSYLVANIA, )
DISTRICT ATTORNEY OF      )
WESTMORELAND COUNTY, and )
BARRY SMITH, Superintendent of )
SCI Houtzdale,              )
                            )
           *Respondents*.  )

## ORDER

**AND NOW**, this 2nd day of February 2023;

**IT IS HEREBY ORDERED** that, for the reasons set forth in the accompanying Memorandum Opinion, the Petition for Writ of Habeas Corpus (ECF No. 3) is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment in favor of Respondents and mark this case **CLOSED**.

**AND IT IS FURTHER ORDERED** that pursuant to Rule 4(a)(1)(A) of the Federal Rules of Appellate Procedure, Petitioner has thirty (30) days to file a notice of appeal as provided by Rule 3 of the Federal Rules of Appellate Procedure.

Lisa Pupo Lenihan
United States Magistrate Judge

Cc:    Orlando Stanford

NU 9901
SCI Houtzdale
P.O. Box 1000
209 Institution Drive
Houtzdale, PA  16698

Counsel of Record
(*via CM/ECF electronic mail)*